May it please the Court, excuse me. My name is James Mason. I represent the appellants John and Tiffany Loudermilk. I plan to reserve three minutes for rebuttal. Just watch the clock, counsel. Under the clearly established law of this circuit in the Supreme Court, no objective CPS investigator or CPS attorney could have reasonably believed on March 9, 2005, that a two-month-old anonymous report about the dangerous conditions inside the home gave them specific, articulable evidence that a child was at that moment in immediate danger as required by this Court in Wallace v. Spencer in the year 2000. Could the – could a reasonable CPS agent believe that they had consent to enter the home? No, Your Honor. Not under the facts of this case when viewed in the light most favorable to the Loudermilks. What do we do then with the finding with respect to the DPS officers in the parallel case? This Court has already said that they had official immunity because they could reasonably believe that they had consent. Are the consent facts different with respect to the CPS agents? Well, they are different in this sense. The CPS agents had almost two months, 60 days' course of dealing. No, I understand that they may have thought – they may not have – let me say, except for purposes of argument, your premise that they didn't have a reason to believe that there was an imminent danger inside the home. I'm asking a different question. Once all these negotiations took place and they went back and forth and your clients eventually said, our lawyer says you may enter, the – this Court took that to mean in the case of the DPS agents that they – they had – could have a reasonable belief that there was consent. And I'm trying to figure out why the belief of the CPS agents would be different under those circumstances. Well, I guess I would say that, first of all, factually, the lawyer didn't say, okay, you may enter. I understand, but this Court's already looked at that. Right, right, right. And I think we need to be consistent where we have some law of the case here. So the question is, why is your case different? Well, it's a – As for consent. As far as the voluntariness of consent, where CPS agents have – have – have threatened to remove children. It really isn't as to the voluntariness. I don't think that's my counsel's – or my colleague's question. His question is, even if involuntary, what was the precedent at the time which would be different for a CPS agent or the lawyer than it would be for the officers who stood in the same position, and they got out on the fact that there was no precedent? Well, I – I don't think it was because there was no precedent. There was no clearly established precedent which would suggest that they should know what they had to do. That's what our former court said. They were out on the second prong of qualified immunity. They were maybe even out on the first prong as to the consent itself. But it certainly seems, reading their – their case, they're out on the second prong. Well, I guess the short answer is, and I – I don't know that this is a satisfactory answer. I think that the unpublished opinion on that point was incorrect, and it's not binding on – it's not binding on the case. Is it a law of the case? Is this – this really isn't quite the same case, although – isn't there some overlap in terms of the defendants? There is no overlap in terms of the defendants. The – the officers arrived on the scene moments before they went to the house, but they're not – there are no defendants here that are overlapping. Well, address the law of the case issue, because that's interesting. It's a single case that gets separated into two motions for summary judgment. I know the prior panel is not nearly as distinguished as this one, but I like to think that they're smart. Are we – can we differ? Can we say, oh, no, Judge O'Scanlon's now reconsidered and he thinks he was wrong the first time? Or are we bound by law of the case doctrine here? I do not believe that you are bound by law of the case, because there are different parties involved and there is a different course of dealings with the plaintiffs. There was a different knowledge base. The CPA's agents had a much longer knowledge, much more knowledge about the facts. How did that go to their – their reasonable understanding of consent? I understand how that goes to whether or not they had the right to come in and look,  Well, it – it – I think the officers were entitled to believe the CPS agents when they said that we have authority to enter this home under exigent circumstances based on their facts. Will you talk – I'm very sympathetic to your exigent circumstances argument. I'm not sure that two months after receiving a complaint you can go into a house without – without a warrant or without more. My question is a very different one. When they get there, a whole series of things ensues. The record makes clear what they are. And eventually, they're allowed into the house. They don't have to break down the door. They don't have to push your clients aside. Your clients say, okay, come in. This Court then says that's enough for the DPS people to reasonably believe they had consent and, therefore, they have official immunity. So tell me what's different about – about the CPS agents and the Assistant Attorney General with respect to consent, not with respect to exigent circumstances in the history, but with respect to consent. Well, with respect to consent, there aren't a whole lot of differences between the two and that the – the officers and the CPS agents on the scene saw the same thing as far as, you know, talking with the attorney and so forth. I think that the prior decision, however, didn't examine the voluntariness of consent issue in light of this Court's previous presence. It wasn't raised, was it? I'm sorry? Was it raised? Yes. The voluntariness? Yes. Yes, it was, Your Honor. And, in fact, this Court's – the unpublished opinion says that the case of Calabretta doesn't even apply. And if I could, I'd take a minute – if I could take a minute to kind of rehabilitate the Calabretta case. In Calabretta, the – many of the facts are very similar to the case before – before this Court today in that a social services officer went to the home, saw the kids, wasn't allowed inside, left the children in the home, came back several days later, and Calabretta itself says that she called the police officer before she went to the home to gain access to the home. The police officer said that if you don't let us in, we'll force our way in. And then, very importantly, this Court said that the social worker used a police officer to intimidate the mother into opening the door, so that – But there's an extra set of facts here, aren't there, that your clients were represented by ABLE counsel – I assume ABLE counsel at the time – and they got on the phone with counsel, and there was a discussion, and counsel talked to the assistant attorney general, and eventually, your client said, okay, you may enter. Does that – does that intermediary, having a lawyer there, do anything to your intimidation claim? I don't believe it does at all, Your Honor. The case law on that point is that there has to be a substantial intervening event that would make it so that a reasonable official in this position could only believe that the consent was completely voluntary, that there was no taint of the prior coercion or the prior – the, you know, the seizure. Here we're surrounded by six – The precedent that would allow these people to suggest that when you got their lawyer involved, and he was on your part negotiating with those who want to enter, and they put together an agreement, the precedent that would say that the CPS officers and counsel were then sure to know should not have done it. What is that precedent? Well, this Court – That's what I think, though I read this mem dispo, and I read what they're saying, and I look at consent, and I look at the second prong. It seems to me they're suggesting. There's nothing there to suggest. They would know that they shouldn't do it. And I couldn't find any precedent, frankly. I couldn't find a case which was dead on, which said, or even close, when you have you get their lawyer involved, and the lawyer is talking to your lawyer, and after they get through talking, representing your best estimates of what you've got going here, that then the agreement that they put together, you should know as a commoner that that's just outside of what they're supposed to do. Well, in this case, the threats to remove the children were – I mean, it doesn't matter about that. They've reached an agreement. If the threats are bad, if it's exigent circumstances, if it wasn't, all of those add in, but now we're at the point, consent. Who would know that's not enough? What case, what circumstance prior to this would know that's not enough? Well, I would say that the threats to remove the children are very relevant here, and that if the family is presented with the option of either saying, you can't come in my home, and if I say that, you're going to take my kids, they're – That all happened before the agreement. Well, that's happening – That all happened before the agreement. They got their lawyer involved. There was a threat. I appreciate that. I didn't like it, in fact. I would say that's terrible, but they got their lawyer involved, and now they put an agreement together. Well, and the lawyer said, I know that this is wrong. It shouldn't be happening, but they're going to do it. I can't stop them. They're wrong in making these threats. They're wrong being at your house, surrounding your house. I can't stop them. You can't stop them, and if you don't let them in your house now, they're going to take your kids. That was what the lawyer – I take it that's what the lawyer communicated to your clients. What did your clients communicate to the CPS and DPS agents? Didn't they just say, okay, my lawyer says I've got to let you in? Yes. Just like the mother in Calabretta, after the police officer said, if you don't let me in, I'm going to force my way in, she turned aside and let them in, so that the children, the very present – real and present threat to the children, this Court has said carries special force in the voluntariness equation, and that's in Brown v. Horrell, in which this Court cited two Supreme Court cases from 1963, Haynes v. Washington and Illinois v. Lynham, and this Court's own case from 1981, the Tingle case, and said that when officials prey on maternal instincts and threaten to remove children, that's worse than threatening to come into the home, or forcing their way into the home. The Court in Brown v. Horrell further said that rather than heed the warnings in Haynes, Lynham, and Tingle to tread cautiously around the subject of familial attachments, the officer deliberately preyed upon Brown's expression of his overwhelming desire to witness his child's birth. The course of dealings here is so clearly established in this circuit that no social worker who comes to the door and threatens to remove kids can reasonably conclude moments after that threat that the consent is voluntary. That threat in this circuit carries special force. I'll reserve the rest of my time. Roberts. You may do so, counsel. We'll hear from the State. Good morning. May it please the Court. James Bowen, Assistant Arizona Attorney General for the Appalachians. As the Court, I think, has already alluded to, this Court has considered essentially the same facts, and with respect to the officers, concluded that there was a reasonable basis to believe that they had probable cause to remove the children, to remove the children from the home, because they were in imminent danger. I mean, they were in imminent danger. Sotomayor, did this Court determine that there was a reasonable basis to remove them on probable cause? I'm sorry? Did this Court determine that there was a reasonable basis to remove the children? Well, I think what the Court's statement was, and I don't have it right in front of me. I haven't had the best. I do. I do. That's why I'm asking. But what the Court's statement was, I believe, and the Court's statement, and you'll correct me if I'm wrong, but they said they had a basis to believe that there was a probable cause to remove the children. I don't think the court said that. I don't think the court said that. No, it said there's probable cause. They had a basis to believe that. Doesn't the Court say there was a basis to believe that they had consent? Well, there was the basis. By the way, I think there's two things. They would not have known that the consent was involuntary. This Court certainly didn't say, at least as I could find it, that they had a reasonable burden, that they had a reasonable basis to believe that they had probable cause to enter. If you can find that in our prior disposition, I'd like to see where. Well, on page 4, it's pretty straightforward if you want to look at it. The Court did say there wasn't a – this threat wasn't baseless. And I don't know what that means. Maybe somebody else. I apologize if I misread that this morning and the rest to get over here. Well, I must tell you, if you were here without consent, I would find Calabretta pretty compelling. Well, and I would differentiate Calabretta for a number of reasons. Actually, I believe this is more like White v. Pierce County. In Calabretta, what we had is some neighbor calls and says, I heard last night somebody scream, and you had a two-month-old complaint here that didn't – and I suppose I shouldn't take judicial notice of the problems that CPS had in Arizona, but we all know how backlogged they were and understaffed they were. But you have a two-month-old complaint that isn't that the parents are beating somebody, it's that there are dangerous conditions in the house. So it's hard to see that, given the age of the complaint, there were exigent circumstances that would have allowed you to push the parents aside and go inside. Are you still arguing exigent circumstances? Well, and I don't want to give up on exigent circumstances. You ought to. But it sounds like I have an uphill battle, so I'll stick with it. You ought to, because you're not going to get me on exigent circumstances. Well, I'm just having a tough time. I don't even need to say anything. My colleague has said it. But here's something sat there for two – how long? Two months. Having said that, this is a 1983 complaint. And they were – and as I read your brief, not only that, it wasn't they went right over to do it, but they were just passing through the neighborhood. And that's why I think – In other words, it wasn't that exigent anyway. They were over there. I don't want to use my time for that, but that's why I believe the exigent circumstance argument works. These two particular workers, this was the first time they'd seen the situation. What they knew is they had a situation where they had a house that was under construction, being built, and that – So do you think that would be enough, even on the first day? Somebody calls you up – an anonymous person, right, calls up CPS and says, there's a couple kids in this house, it's under construction, it's not fully built yet, and it's got perhaps exposed wiring inside. Does that give you – would that be exigent circumstances on day one? If these people had seen it, yes, I believe it probably would. That's what Ms. An anonymous tip on day one gives you – without any demonstration of liability, gives you Fourth Amendment exigent circumstances to enter. We've got magistrates all over town. Pick up the phone and get a warrant. And again, let's go back to the White case and why I hate to spend my time on this, but go quickly to the White case. Well, you don't have to if you just give up on it and move on to consent. But here's the situation, though. They came here, these were electrical wires, at any moment these children could be exposed to. They got – they had the tip, the house was under construction. They get there, they confirm, this is what's going on, this is an unfinished home, that at any moment the child could be exposed to this electrical wire. But they have it for two months. What prevents them in that time period from going to see a neutral magistrate and getting a warrant? And to please the Court, I'll move on, but I go, my position and Ms. Cash's position and Ms. Kramer's position, the two people who were there, they hadn't seen this house two months ago. They saw it for the first time essentially at the same time the police officers did. I'm not even sure there was probable cause. So there's some electric wires exposed. There was no history of any damage to the kids. Apparently, the parents were – protected the kids from whatever the risks there were. This is starting to sound a little curious to me. I'm not going to ask you. Kennedy, let's move on to the other issues. Well, particularly in light of the fact that once they, the social workers did come in, they made a quick decision that there was nothing to worry about. Well, the decision was, and they did see exposed wires as had been reported, but they determined that these were high enough up. Okay. That they didn't pose a serious danger to the children who were in the home. So that's why it was exposed. That just reinforces my doubts about the reasonable risk here, that these are probable cause. Anyway, that's one observation. But they're still in the same position as the police officers when they came there with respect to the children. And that's what I wanted to ask. Had these CPS agents, and they're not agents, but CPS officials, had any prior communication with the plaintiffs in this case? They had not had any – none of them had any prior – So it wasn't as if they called and somebody had said, no, we won't let you in. And so when they knew when they got there, they didn't have any possibility of consent. Ms. Cash, the supervisor, her only involvement and understanding of this case is she had gotten reports from Ms. Cagle, who was the one who was originally assigned to the case. She was aware that there was something going on in this house. That's why they dropped by. But I'm asking about communications with the plaintiffs in this case. Had anybody – Up until that day, my understanding, there's nothing in the record they had any communications directly with Ms. Cash and certainly not with Ms. – Wait. Anybody at CPS have communications with the plaintiffs? Yes. Ms. Cagle, a CPS worker, did have some communication. And what was that communication? Well, the communications were that once she went there to the house and knocked on the door, nobody answered. She left a card. She got a phone call. She explained Ms. Cagle was the investigator, explained what was going on and that they had gotten this report. Ms. Loudermilk said, fine, we'll make arrangements. You can come out and look at the house and do whatever you want because we've got nothing to hide. And that was canceled. Okay. But I'm trying to find out whether or not a reasonable CPS officer would have known in advance that consent was unlikely. And it seemed to me on this record, looking at those things, that the CPS officers heading out there, had they had full knowledge, would have thought that had they made arrangements, the Loudermilks were perfectly willing to let them come in. I don't know that Cash had that detail, and certainly Kramer had none of that detail. Okay. But the only previous communication was make an appointment, you can come out and look. And that was with Ms. Cagle. But that was canceled. That was canceled. And what happened, I believe Ms. Cagle was ill and the Ms. Cash said, hey, we're in the neighborhood, let's swing by, see what the situation is. That's the first time she had any contact. Right. When it was canceled, was it canceled with a communication that, no, we've reconsidered, we don't want to let you in the house or anything like that? I believe you'd have to look at the record again more closely, but the record was it's canceled because our attorneys told us that we shouldn't do this. Okay. So that's so you get a whole report of everything that they're looking for. I was going to say, it wasn't just canceled. It was canceled because we're not doing it. It was canceled because their attorney suggested they should do this. So didn't this is all, I should have started with the bottom line and moved backwards, but I've been a trial lawyer too long. So didn't CPS at least have some notice that before they went out there, not these particular agents perhaps, but before they went out there that people were unlikely to consent to let them in? Here's what the CPS did. They communicated that to CPS before. They communicated that they were going to have us come out there, then they said their attorney said no, and then we came and had a discussion on the phone with our attorneys and the CPS workers on the scene and the attorneys. But what you knew, to state collectively, before these conversations began was that these people had previously refused consent to come into the home. They consented and then they reneged on it or they revoked their consent. And then they had this discussion. I know. But when the discussion began, the CPS officers knew that consent had previously been refused. Right. Rescinded. So if that fact is now factored into the equation, does that make them different than the DPS officers? Well, again, CPS, Cagle knew that. I don't know that Cash or Kramer knew that. But let's assume for a moment that they did. Let's assume I impute the knowledge for the moment. What they know, and it doesn't make them different because with the negotiations and with respect to the consent, is because they said they were told that the reason that they weren't allowed in the home, why it was rescinded, was because their attorney advised them not to do that. Well, but respond effectively to the good judge's question. Does that fact make it any different when the agents and the police go to the home? I don't see that why the agents and the police going to the home would make that fact different other than the fact that, no, I can't. My answer to the Court would be just no. I don't see that it makes us different. That's what I thought his question. Does it make any different for the CPS agents when they and the police went to the home? Might it make a difference given the fact or given the assumption, at least, that the CPS agents knew that there was going to be resistance? Well, that's the question. The police may not have known that. We don't know. When they visited the home, they took the sheriff's office to help, right? Correct. So they knew that they needed the sheriff's office there. Is it normal for the CPS agents to take the sheriff's office every time? Not every time. On cases where they think that there are two situations in this case that they thought they might need backup, one, that they thought the family may be uncooperative, and two, that according to the initial report, that there were guns in the home. And if I read the record, it said they knocked on the door and, again, at that point, asked the plaintiffs if they could inspect to verify there was no unfinished construction and that the plaintiffs even knew they were investigating the report. So at that point, they're asking the same question that had been asked before, correct? Correct. And the plaintiffs said, no, get a warrant, right? Then they got their attorneys on the line. And it's a talk to our attorneys. So I'm just trying to put in perspective my good colleague's question. Is there any difference from the police? Because I don't see any difference, but I just want to make sure you were on the same wavelength as me. It seemed to me they all came to the house at the same time. They asked to get in. They said, no, you'll need a warrant. And then they told the plaintiffs they would not enter without consent. But then they started making threats that I didn't think were appropriate. But they're not in the same they're in the exact same position as the police, because they're essentially, as the Court just pointed out, arrived at the same time. The particular people involved didn't have all the information other than perhaps that the family had been not cooperative in the past. I know you may not want to defend this, but I want to make sure what the State's position is. You don't defend the threat to take the children away, do you? Well, yes and no. Well, I'm not interested in the no. Tell me what the yes is. Yes. I believe that in this case they could legitimately, because I think there was a basis to believe that those children were at any minute. Well, they had an anonymous tip that a house was unfinished and that there was exposed electrical wires inside. And your view is that they could take the children away if somebody refused entry on that information? Yes, because I think like under Burke, they had a very specific, detailed explanation of what the danger was inside. It was a hazard if any of those people were familiar. But what did they see? What did they see? Well, they saw nothing. What did they see on the exterior? What did they see? They saw that it was still under, in fact, under construction, which was consistent with the report. Well, that hasn't anything to do with all the things that made this dangerous. And that's why I point, and I've got less than two minutes. That's why I'm worried about your answer. Well, that's why I point the Court to White v. Burke, because what they, in that case, had a child who somebody said, oh, I saw this child in the front yard with a bunch of welts in their house. Police went there and said, hey, we've got this report. We want to check this out. And the child started to say, oh, hey, look. And the father got very upset and said, get back. But there they saw they only saw the child. They didn't see any welts. They saw nothing. In fact, when they got into the house, there were no welts on the child. So this, to me But there the tip was about actual harm to the child. In other words, this child has been harmed because I saw welts. Here you've got what's the potential, I guess, of harm, right? Well, no, and it's true this is different, but the reality is these kids were still an imminent risk of danger if, in fact, that information were be correct. Bottom line, I have 18 seconds left. I first do believe that there was probable cause. I believe that exigent circumstances, but I understand the Court doesn't believe that. But to put all of that aside, this case is the same case that this Court has previously decided. Sotomayor, is there anything in the record that tells us the source of this anonymous tip? I'm looking at page 0369, which is the Report Summary, which lays out the basis upon which. The only thing in the record that's in the record, as I think the Court may know, these are anonymous. At least they're not disclosable. But I believe that in the record, there was some testimony that the plaintiffs believed that the tip was from a neighbor. The only thing in the record the tip came from a neighbor, but that's the only thing in the record. And what always bothers me about these confidential informants and these tips is that often there's a motive that goes with the tip. And I'm just wondering if this was a motive or something that went along with a tip. It was just somebody indicated to the State that this condition existed. Thank you. Thank you, counsel. Your time has expired. Mr. Mason, you have some reserve time. Thank you, Your Honor. I'd like a do-over on part of the answer that I gave before. This Court in the unpublished opinion says, Moreover, a reasonable police officer would not have known that consent was involuntary when the police officers withdrew their initial threat to enter the Loudermax home without a warrant. So these two groups of agents, the police officers, originally said, look, we're coming in. And the sergeant arrived and they backed off and they said no. The CPS agent said, if we can't come in, we're taking your kids. So what this Court held about the police officers in the unpublished opinion clearly doesn't apply to the CPS workers. Another thing that needs to be pointed out, this Court's clearly established precedents say that even if a – if – well, that the CPS agents had a duty not only to investigate the occupancy permit and so forth, but they had a duty to investigate the occupancy permit and so forth, they had a duty to intrude into the family relationship to the least amount possible. In this case, there was no allegation that the parents themselves presented a risk to the children. It was only about the premises. They didn't have to remove the kids to protect them. They could have said, why don't you guys go to the park while we go to the courthouse? Or why don't you guys check into a motel tonight while we go to the courthouse? If the judge says we can come in, we'll know the kids are safe. If the judge says we can't come in, you can come back. So the threat to remove the kids was not justified. It was a tactic. It was a common thing. And it was used for the express purpose of overcoming the will of these people. It was intended to coerce them into allowing them into the home so that they could complete the investigation. There's really almost no other way that the record could be read in this way. So when the lawyer got involved, the lawyer could not have possibly been an intervening circumstance that would remove the taint of the illegal threat, the illegal seizure, and so forth. Robertson, I don't know who the lawyer was, tell them no. Tell them to go get a warrant and tell them that if they go inside, we're going to file a 1983 suit against them. He did all of that. Did they tell that to the agents? The lawyer did tell that to the agent, to the officer, to the defendant Cash, and to the lawyer. I'm not sure that he said that he was going to sue for 1983, but he did say you don't have authority, you don't have justification. That's to the assistant attorney general. Yes. But not to the CPS agents. I believe he did. Send it to the CPS. To Rhonda Cash. Yes, Your Honor. They were all together, right? Well, the phone was being handed. There was a phone. I'm trying to figure out who heard what on the phone. He looked at everybody there. The phone was passed to everybody. His entire purpose of being on the phone was to tell them they didn't have authority. And they go through this whole negotiation, and it eventually says, okay, go in. Right? Well, the negotiation ended when one of the agents started filling out a temporary custody notice, which meant the kids are going to be taken any moment. And do the cops hear all of this, too? They were all on the scene. Yes, Your Honor. Thank you, Your Honor. We urge reversal. Thank you very much, Counselor. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Smith, Hurwitz